Commonwealth ex rel. Ford, Appellant, *v.*
Hendrick.
Commonwealth ex rel. Tucker, Appellant, *v.*
Hendrick.

Argued June 13, 1969. Before WRIGHT, P. J., WAT-KINS, MONTGOMERY, JACOBS, HOFFMAN, and CERCONE, JJ. (SPAULDING, J., absent).

*David Kairys,* Assistant Defender, with him *Frank Wright,* Assistant Defender, and *Vincent J. Ziccardi,* Acting Defender, and *Anthony G. Amsterdam,* for appellant.

*Paul R. Michel,* Assistant District Attorney, with him *James D. Crawford,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for appellee.

OPINION PER CURIAM, September 11, 1969:
Order affirmed.

---

CONCURRING OPINION BY WRIGHT, P. J.:
Pretrial or preventive detention is not the issue in these appeals. The court below set reasonable bail in each case. What appellants actually request is that, since they are indigents, they should be released without any bail whatever. This request was properly refused by the court below, and it is that action which we are affirming.

DISSENTING OPINION BY HOFFMAN, J.:

These cases raise fundamental questions of first impression in this Commonwealth concerning the right to bail, the setting of bail and detention of an accused prior to his being brought to trial for a noncapital crime.[1]

Both defendants in the instant cases are indigent. Both are accused of robbery and the testimony adduced at their bail hearings indicated that there is a substantial question as to whether they were properly identified by the victim.

After a hearing bail was set for appellant Tucker at $3,000 and for appellant Ford at $1,000. The court however, failed to state reasons for its setting of bail in these amounts. Likewise, the Commonwealth did not indicate to the court why it felt that bail in these amounts was appropriate. Neither appellant, due to his indigency, however, has been able to meet bail. Consequently, they have been imprisoned in the Philadelphia County Jail since early March, 1969.

They now claim that the imposition of bail in these amounts operates to deny them their right to a nonexcessive bail.

---

[1] *Commonwealth ex rel. Alberti v. Boyle*, 412 Pa. 398, 195 A. 2d 97 (1963) was concerned solely with the right to bail in capital cases which is subject to a distinct state constitutional principle. *Commonwealth ex rel. Goodfellow v. Rundle*, 203 Pa. Superior Ct. 419, 444, 201 A. 2d 615 (1964), rev'd on other grounds 415 Pa. 528, 204 A. 2d 446 (1964), in dictum states that "the defendant should be admitted to bail for appearance at his retrial on the charge for which he was sentenced, unless he is lawfully detained on another sentence or charge." This passage can hardly be considered definitive or even to import an absolute right to bail in noncapital cases. Rather, it merely elucidates that a prisoner granted a new trial is accorded the right to bail, without defining the parameters of that right. This latter consideration was plainly beyond the scope of the questions before the court.

To deal with this case, two issues must be considered. (1) Do appellants have a right to bail; and (2) if so, was appropriate bail set by the lower court.

## I

In considering an accused's right to bail, reference must be made to the Eighth Amendment of the Federal Constitution which provides: "excessive bail shall not be required . . ." No case has explicitly determined whether this clause has been incorporated by the Fourteenth Amendment's due process clause and is thereby binding upon the states.

The only case incorporating a section of the Eighth Amendment is *Robinson v. California,* 370 U.S. 660 (1962), which incorporated only the cruel and unusual punishment clause of that amendment. The United States Supreme Court, however, in *Benton v. Maryland,* 395 U.S. 784 (1969), has apparently repudiated the doctrine of selective incorporation of the Bill of Rights into the Fourteenth Amendment. "Our recent cases have thoroughly rejected the Palko notion that basic constitutional rights can be denied by the States as long as the totality of the circumstances does not disclose a denial of 'fundamental fairness.' Once it is decided that a particular Bill of Rights guarantee is 'fundamental to the American scheme of justice,' Duncan v. Louisiana [391 U.S. 145, at 149], the same constitutional standards apply against both the State and Federal Governments. Palko's roots had thus been cut away years ago. We today only recognize the inevitable." At 795.

The requirement that "excessive bail shall not be required" is deeply rooted in our jurisprudence and rests on the assumption that an accused should not be capriciously held in jail pending his trial. As such, the

Eighth Amendment is "fundamental to the American scheme of justice" and therefore is binding upon us.

It is unclear, however, from a literal reading of the Amendment whether bail is required in every instance. On its face, the Amendment only requires that if bail is set, it cannot be in an "excessive" amount. This reading would, of course, produce the extraordinary result, that a constitutional principle would be dependent upon a legislative act, detailing those instances when bail should be set. See Foote, The Coming Constitutional Crisis in Bail, 113 Univ. of Pa. L. Rev. 959 (1965).

Alternative interpretations of the Eighth Amendment are (1) that a court retains discretion to deny bail altogether on certain limited grounds and (2) that there is an absolute right to bail.

Professor Foote, who has written extensively of the history of the Eighth Amendment, concludes that the founding fathers intended to provide an absolute right to bail.

Nonetheless, the United States Supreme Court in *Carlson v. Landon,* 342 U.S. 524 (1952), stated that there is no such constitutional right. "The contention is also advanced that the Eighth Amendment to the Constitution . . . compels the allowance of bail in a reasonable amount. . . ."

"The bail clause was lifted with slight changes from the English Bill of Rights Act. In England that clause has never been thought to accord a right to bail in all cases, but merely to provide that bail shall not be excessive in those cases where it is proper to grant bail. When this clause was carried over into our Bill of Rights, nothing was said that indicated any different concept. The Eighth Amendment has not prevented Congress from defining the classes of cases in which bail shall be allowed in this country. Thus in criminal

cases bail is not compulsory where the punishment may be death. Indeed the very language of the Amendment fails to say all arrests must be bailable. We think, clearly here that the Eighth Amendment does not require that bail be allowed under the circumstances of these cases" (where the accused's release would threaten national security). At pp. 544-546.

It is apparent that even the justices who dissented from the majority opinion had no quarrel with the proposition that bail may be denied in some circumstances is appropriate. Justice FRANKFURTER, in a dissent in which Justice BURTON joined, stated that "It would be unfair to Congress to deny that it followed the traditional concept of bail by making 'the danger to the public safety of (the accused's) presence within the community' a criterion for bailability." Justice FRANKFURTER'S only criticism of the majority was that in applying this standard "the Attorney General has not exercised his discretion by applying the standards required of him. He evidently thought himself under compulsion of law and made an abstract, class determination not an individualized judgment." At pp. 563-564.

Mr. Justice BLACK in his dissent indicated that while bail might properly be denied in certain circumstances (capital cases), such action is inappropriate in deportation proceedings. "It is true bail has frequently been denied in this country 'when the punishment may be death'. I fail to see where the Court's analogy between deportation and the death penalty advances its argument unless it is also analogizing the offense of indoctrinating talk to the crime of first degree murder." At p. 557.

Mr. Justice DOUGLAS the fourth dissenter based his dissent on grounds "deeper than the bail provisions of the Eighth Amendment," that is, his belief that the

prosecution of appellants violated their First Amendment rights.[2]

It is apparent, therefore, that *Carlson* stands for the proposition that an accused whose presence on the street would endanger the public safety may be held without bail prior to trial.[3]

---

[2] See also *Carbo v. United States*, 82 S. Ct. 662 (1962), where Mr. Justice DOUGLAS sitting as a Circuit Court judge denied bail pending an appeal following appellant's convictions for racketeering, extortion, and conspiracy. Although he found that there was a "substantial likelihood" that the appellant would be granted a new trial, Mr. Justice DOUGLAS held, nonetheless, that since releasing the appellant would result in the probability of danger to witnesses he may be properly held without bail.

Similarly former Chief Justice WARREN, sitting as a Circuit Court judge, stated in *Leigh v. United States*, 82 S. Ct. 994, 8 L. Ed. 2d 269, 271 (1962) (which dealt with bail pending appeal) that "[bail] is to be denied only in cases in which, from substantial evidence, it seems clear that the right to bail may be abused or the community may be threatened by the applicant's release." See *Painten v. Commonwealth of Massachusetts*, 254 F. Supp. 246 (1966) for a compilation of cases dealing with this issue.

[3] *Stack v. Boyle*, 342 U.S. 1 (1951), which was decided four and one half months before *Carlson*, does not conflict with the conclusion reached therein. In *Stack* appellants were arrested on charges of conspiring to violate the Smith Act, and bail was set in the uniform amount of $50,000 for each petitioner. Petitioners moved to reduce bail on the ground that bail as fixed was excessive under the Eighth Amendment.

The Court considered appellant's claim as arising under Federal Rule of Criminal Procedure 46(c) which conditions the right to release before trial *solely* on the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty. In this context the court held that the Eighth Amendment requires that bail which is excessive to facilitate this statutory purpose is unconstitutional and the case was remanded to the lower court so that a hearing could be held for the purpose of fixing reasonable bail. Accordingly, the court never reached the question of preventive detention and the "conclusion (the Eighth Amendment secures an *absolute right to bail in noncapital cases) is not* supported by the holding in Stack v. Boyle." Note, Preventive De-

Moreover, *Stack v. Boyle,* 342 U.S. 1 (1951), indicates that an accused may also be held without bail if his presence at trial cannot be assured by requiring him to post a bail bond. Specifically, *Stack* dealt with Federal Rule of Criminal Procedure 46 (c) which provided that an accused's right to release before trial is conditioned upon his "giving adequate assurance that he will stand trial and submit to sentence if found guilty." *Stack* at 4. The Court stated that in proceedings under this Rule, the Eighth Amendment only proscribes bail "set at a figure higher than an amount reasonably calculated to fulfill this purpose." If the court finds that no amount of bail will deter an accused from jumping bail, then it follows that the accused may be held without bail.

If the Eighth Amendment is deemed to be carried over to the states under the reasoning of *Benton v. Maryland,* the States should not be required to set bail, under the Federal Constitution, in those instances where there is no federal constitutional requirement. "If the Constitution (imposes a duty on the States) it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." *Bolling v. Sharpe,* 347 U.S. 497 (1954). It would appear, therefore, that an accused does not have an absolute federal constitutional right to bail prior to trial.

There are, however, independent bail provisions in the Pennsylvania Constitution. Article I, §14 provides that "All prisoners shall be bailable by sufficient sureties, unless for capital offenses when the proof is evi-

tention Before Trial, 79 Harv. L. Rev. 1489 (1966). Indeed, "Most cases . . . refer to the right to bail, if any, as statutory in origin." Altman and Cunningham, Preventive Detention, 36 G.W.L. Rev. 178 (1967). See *Greenwood v. United States,* 219 F. 2d 376, 386 (8th Cor.), *aff'd,* 350 U.S. 366 (1956), *Hudson v. Parker,* 156 U.S. 277, 285 (1895).

dent or presumption great; . . ." Article I, §13 provides that "Excessive bail shall not be required, . . ." Both provisions were originally in the State Constitution of 1790, as well as the Constitution of 1776.

These sections have never been interpreted to mean that there shall be an absolute right to bail in all noncapital cases. Indeed, the only authority delineating their scope is Supreme Court Rule of Criminal Procedure 4002, which makes the setting of bail a matter of court discretion.[4] Thus, Article I, §14 which provides that "all prisoners shall be bailable by sufficient sureties" must be interpreted to apply only in those instances where bail is appropriate. Two considerations are paramount in considering the appropriateness of bail.

First, it has traditionally been thought that bail must serve as an incentive to require the appearance of the accused at his trial. Our Supreme Court in adopting Rule of Criminal Procedure 4005 stipulated that "The amount of bail shall be such as to ensure the presence of the defendant, and shall be determined according to, but not solely upon, the following criteria: (1) The nature and circumstances of the offense and the stage of the prosecution then existing; (2) The age, residence, employment, financial standing and family status of the defendant; (3) Defendant's character, reputation and previous criminal history; and, (4) Defendant's mental condition."

The inference to be drawn from these criteria is that if no amount is sufficient to ensure the defendant's presence, bail procedures should bar his release.

---

[4] Rule 4002 provides that an issuing authority *may* admit an accused to bail in "all cases as now provided by law." In those instances "where the issuing authority has no jurisdiction to admit to bail" then application may be made to a court for bail. A "court *may* grant appropriate relief where bail has been denied or excessive bail demanded (by an issuing authority)."

In such circumstances high bail, which is beyond the means of the accused, is not excessive under Article I, §13 because it accurately reflects the risk that the accused will not appear at trial. The analysis supporting this point is, of course, identical to that in *Stack v. Boyle*, supra.

Second, the concept has been advanced that a court may detain an accused without bail to prevent his committing further dangerous acts. Although no Pennsylvania case either endorses or rejects this principle, I believe that the analysis in *Carlson v. Landon*, supra, although not controlling supports this conclusion.

Specifically, the thought inherent in *Carlson* is fully expressed in Justice FRANKFURTER'S dissenting statement that "the danger to the public safety of (an accused's) presence within the community is a criterion for bailability." *Carlson* indicates therefore that detention in such circumstances is a factor that has been traditionally incorporated into our notions of a workable system of criminal justice.[5]

---

[5] Professor Dershowitz of the Harvard Law School agrees. "The debate over pre-trial preventive detention has proceeded on the assumption that confining people on the basis of predictions of future crime is unprecedented in this country (and throughout the civilized world.) Opponents of the proposal are fond of quoting Justice JACKSON'S dictum in (Williamson v. United States, 184 F. 2d 280 (2d Cir. 1950)), where the government sought to deny bail to a number of Smith Act defendants:

" 'If I assume that defendants are disposed to commit every opportune disloyal act helpful to Communist countries, it is still difficult to reconcile with traditional American law the jailing of persons by the courts because of anticipated but as yet uncommitted crimes. Imprisonment to protect society from predicted but unconsummated offenses is so unprecedented in this country and so fraught with danger of excesses and injustice that I am loath to resort to it. . . .'

"But Justice JACKSON'S history is simply incorrect: 'imprisonment to protect society from predicted but unconsummated of-

Moreover, "It has been suggested that the public interest in protecting persons and property is as great as the interest in protecting the administration of justice and that it is unreasonable to say that only the latter may be protected through pretrial detention. The distinction between denial of bail to prevent flight and denial to prevent other criminal conduct, it is argued, is misleading: both involve detention before conviction based on predictions as to future unlawful conduct; both equally merit the description 'preventive detention,' and both are in the same position with respect to due process." Note, Preventive Detention Before Trial, 79 Harv. L. Rev. 1489 (1966).

This view has been criticized on the basis that there is a significant difference between these two purposes which weighs in favor of allowing a court to refuse bail only when there is a significant danger that the accused will fail to appear at his trial: "The public interest in the prevention of dangerous acts is great, but there is an established method of protection against such acts: the threat of sanctions imposed through the criminal law." Note, Preventive Detention Before Trial, supra. This distinction is fallacious, however, be-

---

fenses' is quite common in this and every other civilized country. A Justice of the Supreme Court of Burma came closer to the truth when he observed that preventive justice which consists in restraining a man from committing a crime which he may commit but has not yet committed . . . is common to all systems of jurisprudence.' (Maung Hla Gyaw v. Commissioner, 1948 Burma Law Reps. 764, 766).

"No system of jurisprudence has ever required that its law enforcers always sit back and wait until the spear has been thrown, or even until the gun has been loaded. Societies have differed in their techniques of crime prevention, but for centuries people throughout the world have been imprisoned 'to protect society from predicted but unconsummated offenses.' . . . ." Dershowitz, Preventing "Preventive Detention," New York Rev. of Books, vol. XII, No. 5, March 13, 1969.

cause the same criminal sanctions exist when an accused jumps bail and when he commits a crime while on bail. In the latter instance, he will be separately charged and tried for that offense. In the former instance, however, the accused is likely to receive a more severe sentence following his conviction because of his jumping bail. Foote, The Coming Constitutional Crisis in Bail, supra. Thus, in both instances, criminal sanctions operate to deter the criminal act.

In addition, it seems to me that there is the same degree of difficulty in predicting when an accused will jump bail as in predicting when he will commit a future crime if bail is set.

Further, detention based upon a person's dangerous propensities is sanctioned in other areas of the law, "A prediction of future dangerous conduct forms the basis for confinement in a number of civil proceedings, such as commitment of the mentally ill, of sexual psychopaths, and of defective delinquents. Commitment statutes for sexual psychopaths and defective delinquents are designed to protect society by confining for an indeterminate period certain offenders who have shown a course of habitual misconduct, and to provide these offenders with medical treatment for their cure. . . . The constitutionality of these statutes has been upheld against attack on equal protection grounds, the courts holding that the legislature could define a class presenting a special danger if the classification were based on reasonable and substantial distinctions and were in accord with the aims sought to be achieved." If it is determined that danger of repeated criminal acts is "greater in the case of defendants awaiting trial than in the case of other potential offenders, an analogous civil proceeding to provide preventive detention before trial might be acceptable." Note, Preventive Detention Before Trial, supra.

Such findings can of course be made. It is true that "predictions of the kind relied upon by the proponents of preventive detention are likely to be unreliable. Predictions of human conduct are difficult to make, for man is a complex entity and the world he inhabits is full of unexpected occurrences. Predictions of rare human events are even more difficult. And predictions of rare events occurring within a short span of time are the most difficult of all. Acts of violence by persons released while awaiting trial are relatively rare events (though more frequent among certain categories of suspects), and the relevant time span is short. Accordingly, the kind of predictions under consideration begin with heavy odds against their accuracy." Dershowitz, Preventing "Preventive Detention", New York Rev. of Books, vol. XII, No. 5, March 13, 1969. For similar expressions see Professor Dershowitz's testimony before the United States Senate Subcommittee on Constitutional Rights of the Committee on the Judiciary, Thursday, January 23, 1969. Hearings p. 172 et seq.

Nonetheless there are certain individuals whose past record reflects that they are habitual criminals, unrestrained, amoral, and without conscience or regard for the consequences of their acts. These individuals, while few in number, are often recognizable by judges and fall within the class of persons referred to as criminal sociopaths. Representative histories of such cases are available in the files of the Philadelphia Police Department. They portray individuals who repeatedly within short periods of time commit the most vicious crimes of violence. It is this class of persons which represents a predictable threat to the community.

In this light, it is impossible for me to conclude that absent a clear indication to the contrary, the Pennsylvania Constitution meant to exclude detention of dangerous persons under all circumstances.

However, since preventive detention is necessarily founded upon a nonprovable assumption that the defendant will commit a future crime, it should only be invoked when the community's interest is sufficient to override the generally repugnant policy of imprisoning a defendant for a crime he did not yet nor may ever commit.

Three preconditions, in my opinion, therefore, must be met before such detention becomes appropriate:

*First*, since an accused is entitled to a presumption of innocence until he has been found guilty, the Commonwealth must prove by clear and convincing evidence that the accused is highly likely to commit criminal acts if released and that he has committed the crime for which he is charged.[6]

*Second*, that these crimes would seriously *physically* endanger the safety of members of the community.[7]

---

[6] See Testimony of Chief Judge HAROLD H. GREENE, District of Columbia Court of General Sessions, before the United States Senate Subcommittee on Constitutional Rights of the Committee on the Judiciary, Tuesday, January 21, 1969, at p. 41.

[7] The American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Pretrial Release, (Tentative Draft, March, 1968) while neither endorsing nor rejecting preventive detention, has formulated a model preventive detention proposal which is consistent with the above stated principles. This proposal seeks to meet the objection to preventive detention "that sufficiently accurate predictive techniques are not available and that, as a consequence, many defendants with criminal records are likely to be detained on the basis of speculation that they are likely to commit criminal acts if released. See Foote, Crisis in Bail: II, 113 U. Pa. L. Rev. 1125, 1167, 1169-74 (1965) ... The operating principle is that only defendants charged with felonies involving *bodily harm* or who, having been charged with *any* felony, are known to have been convicted of a violent felony within the last five years are subject to detention. Moreover, such defendants cannot be detained unless there is evidence, in addition to the past criminal record which justifies a finding that if re-

*Third*, that the less restrictive alternatives of: (a) prohibiting the defendant from approaching or com-

leased they would be highly likely to threaten or inflict bodily harm on another person." At 83. The proposal follows:

"**1.1** *Statement of policy.*

Normally, the defendant should be released on an order to appear or on his own recognizance. To ensure the defendant's appearance, the court should impose reasonable, nonmonetary conditions upon release. Money bail should be abolished [except that in appropriate cases the defendant may be required to execute an unsecured, personal bond in a reasonable amount]. Subject to the limitations set out below, defendants charged with certain serious crimes should be denied release pending trial where there is shown to exist a high degree of probability that if released, they would inflict serious bodily injury on another or would leave the United States to avoid prosecution or to dispose of the fruits of the alleged crime.

**1.2** *Procedure at first appearance.*

At defendant's first appearance, the judicial officer should release him on his own recognizance or upon such conditions as the prosecutor and the defendant have agreed; or, where there is no such agreement, upon such conditions as the judicial officer shall fix. However, where the prosecutor gives notice that he intends to apply for an order detaining the defendant pending trial, the judicial officer should immediately transfer the case to the court of general criminal jurisdiction. Where practicable, the prosecution should give such notice sufficiently in advance of first appearance so that all proceedings in the case may be had in the court of general criminal jurisdiction.

. . .

**1.4** *Application for detention order.*

The prosecutor should be authorized to apply to the court of general criminal jurisdiction for a detention order only in the following cases: (a) where the defendant is accused of a capital crime; (b) where there is reasonable cause to believe that the defendant has committed a felony while at liberty pending trial of a prior criminal charge or pending appeal; (c) where the defendant is charged with a felony involving the infliction of or a threat to inflict serious bodily harm on another and there is a high degree of probability that, if released, he will inflict serious bodily harm on another; (d) where the defendant is charged with a felony and is known to have been convicted within the last five

municating with particular persons or classes of persons, except that no such order should be deemed to

years of a felony involving the infliction of or threat to inflict serious bodily harm on another and there is a high degree of probability that, if released, he will inflict serious bodily harm on another person; (e) where the defendant is charged with a felony and there is found to be a high degree of probability that, if released, he will threaten or inflict serious bodily harm on another for the purpose of intimidating or incapacitating witnesses; (f) where the defendant is charged with a felony and there is reasonable ground to believe that, if released, he would leave the United States for the purpose of avoiding prosecution or for the purpose of secreting or disposing of the fruits of the alleged crime.

1.5 *Procedure upon application for detention order.*

(a) Provision of counsel and assistance.

Upon the filing of an application for a detention order the court should immediately determine whether the defendant is financially able to defend against such an application and, if not, the court should provide counsel, reasonable investigative assistance, and such expert witnesses as reasonably may be required.

(b) Hearing.

(i) An evidentiary, nonjury hearing should be held within two days of the filing of the application for a detention order. The defendant should be granted a reasonable continuance where required to enable him adequately to prepare for the hearing. (ii) The prosecution should have the burden of proving the necessity for detention by clear and convincing evidence. (iii) In the event the defendant should testify, his testimony should not thereafter be admissible evidence in these or any other proceedings. (iv) If a detention order is granted, a complete record of the hearing, including a verbatim transcript or mechanical recording of the testimony, should be made available to the defendant immediately.

(c) Order releasing defendant subject to restraining order:

If, after the hearing, the court determines that pretrial detention is not warranted, it may nevertheless release the defendant subject to an order.

(i) restraining him from frequenting certain areas or premises; (ii) restraining him from initiating any contact or communicating with certain persons; (iii) restraining him from having in his possession any dangerous weapon; (iv) requiring him to report to a law enforcement agency or probation office at frequent intervals;

prohibit any lawful and ethical activity of defendant's counsel; (b) prohibiting the defendant from going to

and (v) imposing any other reasonable restrictions calculated to prevent anticipated harm.

1.6 *Violations of restraining order.*

Upon a verified application alleging that a released defendant has violated a restraining order under which he was released, the court may issue a warrant directing that he be arrested and presented forthwith for hearing. A law enforcement officer having reasonable cause to believe that a felony defendant has violated such a restraining order should be authorized, where it would be impracticable to secure a warrant, to arrest the defendant and present him forthwith to the court.

1.7 *Sanctions for violations of conditions.*

After hearing, and upon finding that the defendant has violated a reasonable restraining order under which he was released, the court should: (a) impose different or additional restrictions on defendant's release; or (b) revoke his release.

1.8 *Detention order.*

In the event it should be found, on the basis of detailed, written findings of fact, that there is a high degree of probability that the defendant, if released, would inflict serious bodily harm on another or would leave the United States for the purpose of avoiding prosecution or disposing of the fruits of the alleged crime, the court should enter an order detaining the defendant pending disposition of his case and ordering that his trial commence within 30 days.

1.9 *Compensation for detained defendants.*

Every detained defendant who is not thereafter convicted of any crime should be compensated at the rate of at least [$8.00] per day. Where the defendant has persons dependent on him, the compensation should be made available to his dependents for support and maintenance.

1.10 *Interlocutory review of detention order.*

Immediate appellate review of a detention order should be available to every detained defendant. The record should be prepared promptly and the case advanced on the calendar of the appellate court in order to ensure that the trial of the case shall not be delayed. The appellate court should be empowered to affirm, reverse or modify the order of the trial court. All costs, including reasonable counsel fees, should be chargeable to the state;

certain described geographical areas or premises; (c) prohibiting the defendant from possessing any dangerous weapon, or engaging in certain described activities or indulging in intoxicating liquors or in certain drugs; (d) requiring the defendant to report regularly to and remain under the supervision of an officer of the court, would be inefficacious. See American Bar Association, Project on Minimum Standards for Criminal Justice, Standards Relating to Pretrial Release, March, 1968, Tentative Draft, (Hereinafter A.B.A., *Pretrial Release*), section 5.5.

---

provided, however, that the appellate court should be empowered to withhold counsel fees (to other than assigned counsel) where it finds that the appeal was clearly frivolous.

1.11 *Trial.*

The fact that the defendant has been detained pending trial should not be allowed to prejudice him at the time of trial or sentencing. Extreme care should be taken to ensure that the trial jury is unaware of the defendant's detention.

(a) All defendants should be accompanied into the courtroom by apparently unarmed personnel in plain clothes. In most cases there should be no need for any guard to be stationed conspicuously near the defendant.

(b) In the case of detained defendants, care should be taken to ensure that differences in dress and in the manner or treatment do not distinguish them from defendants who have been at liberty pending trial.

(c) In order to prevent invidious inferences, no defendant should be permitted to enter or leave the courtroom through the public corridors, and all other reasonable steps should be taken to prevent contacts between jurors and defendants outside the courtroom.

(d) In the event of conviction, the sentencing court should not regard a pretrial detention order as any evidence of the need to impose a prison sentence. In the event a prison sentence is imposed, the defendant should receive credit for all time spent in custody as a result of the criminal charge for which the sentence is imposed, or as a result of the underlying conduct upon which such a charge is based."

These determinations, as well as the decision to hold an accused who presents an undue risk of failing to appear for trial, without bail, however, can only be made by a court after a full and complete hearing wherein the accused is given the right to counsel, the right to cross-examine and confront witnesses against him, and the right to present evidence on his own behalf. This is necessitated by the consideration that the accused's freedom, albeit for a limited time, is at stake and depends on a fact determination independent of whether he committed the crime for which he is charged.

*Specht v. Patterson,* 386 U.S. 605, is particularly illuminating in this regard. In *Specht,* the court considered whether a convicted rapist is entitled to notice and a full and fair hearing when the state attempts to sentence him to an *indeterminate term* under a sex offender's act designed to protect the public from "threat of bodily harm".

The Court held that since the imposition of sentence under the sex offender's act was "a separate criminal proceeding" from the actual trial wherein appellant's guilt was adjudicated, appellant was entitled to "all those safeguards which are fundamental rights and essential to a fair trial, including the right to confront and cross-examine the witnesses against him." Quoting from *U. S. ex rel. Gerchman v. Maloney,* 355 F. 2d 302, 312 (3d Cir.).

The court likened commitment under the sex offender's act to imprisonment under an habitual offender act, which in turn is similar to preventive detention prior to trial. In all those instances, as well as when an accused is denied bail because of fear that he will fail to appear for trial, the commitment is designed to prevent future criminal conduct. The predictability of such actions is distinct from the question of the ac-

cused's guilt or innocence of any crime for which he may have been charged. Accordingly, the reasoning in *Specht* indicates that refusing bail to an accused can only be done after a full hearing.[8]

Similarly, if the court purposely sets bail at an amount that the accused cannot be expected to meet, this would be equivalent to a denial of bail to the accused since it results in his continued confinement. This, of course, is not an uncommon phenomenon. "In some cases . . ., bail is deliberately set out of the reach of the defendant because of the fear that he would commit crimes if released." A.B.A. *Pretrial Release*. In this circumstance, too, the accused would be entitled to the procedural safeguard of a full hearing.[9]

Due process, it seems to me, also requires that if an accused is held in jail continuously, prior to trial, the Commonwealth is under a duty to alleviate the obvious hardships that result. For instance, while confined in jail, "1. The accused is not free to assist in the preparation of his case and the location of witnesses. 2. The

---

[8] *Commonwealth v. Dooley*, 209 Pa. Superior Ct. 519, 232 A. 2d 45 (1967) applied the *Specht* test to the Barr-Walker Act, The Act of January 8, 1952, P. L. (1951) 1851, 19 P.S. §§1166.1174.

[9] In the same vein, "high bail is sometimes used to prevent the commission of additional crimes or the intimidation of witnesses. For example a study of bail in New York City reported that one district attorney's office recommended high bail for narcotics offenders in order to 'protect society' and for those charged with receiving stolen property in order to 'control fences' and reduce the number of burglaries. At the National Bail Conference, a Florida circuit solicitor stated that: 'In the multiple burglary ring situation, there is no question about it when the judge sets bail on a dozen burglaries, he is setting it with the idea that he is going to keep that fellow in jail until that trial is concluded.' Some judges, while admitting that they consider the likelihood of further crimes in setting bail, maintain that this factor is relevant to the likelihood that the defendant will appear for trial." (footnotes omitted) Note, *Preventive Detention Before Trial*, supra.

conditions [for defense counsel preparing him] for trial are not satisfactory. 3. . . . [T]he accused will waive his right to trial by jury to obtain a more prompt hearing. 4. . . . [T]he accused [will have less an] opportunity to choose his own lawyer. 5. The accused is exposed to bad jailhouse advice. 6. There is an adverse effect on the personality and morale of the accused as a result of 'jailhouse depression.' . . ." Altman and Cunningham, Preventive Detention, 36 G.W.L. Rev. 178 (1967). The accused, therefore, should be brought to trial as promptly as possible. Sixty days, in my view, is adequate time to prepare for trial and the appellant should be tried within that time. As an operative principle, therefore, I would require such speedy trials, barring extraordinary circumstances. Moreover, during the confinement of an accused prior to trial, he should likewise be entitled to secure witnesses in his behalf. If his personal participation is essential and proper controls can reasonably be made available, supervised temporary releases might be advisable.

## II

If, however, the court determines that an accused should be released pending trial, "Money bail should be set only when it is found that no other conditions on release will reasonably assure the defendant's appearance in court." American Bar Association, Project on Minimum Standards for Criminal Justice, *Pretrial Release,* Section 5.3(a).

In the vast majority of cases, and in all cases involving indigents, who are judgment proof, the posting of bail by an accused has little effect on his decision to appear at trial. The amount forfeited in most instances is of a minimal nature, and requiring that bail

be posted acts more to inconvenience the accused, than to advance any legitimate interest of justice.[10]

Thus, as an operating principle I would find bail irrelevant to the release decision unless an accused has substantial assets which he would forfeit if bail were required and he jumped bail. Requiring bail in that instance would not discriminate against the accused so as to deny him equal protection of the laws. Rather, the accused's ability to post a substantial bond works in his favor as he is able to present an additional factor which would indicate that he would appear for trial. Accordingly, the court would be less hesitant to keep him imprisoned prior to trial. Nor does this formulation deny the indigent equal protection of the laws. His inability to post bond is a factor which does bear on his likeliness to appear for trial. I can think of no reason, therefore, why this is not as much a legitimate factor to be considered by the court in making a release decision as those other factors which are specified by Pennsylvania Rule of Criminal Procedure 4005 such as an accused's residence, employment and family status.

Moreover, if a court determines that money bail within the accused's means, is appropriate, the amount

---

[10] Herbert Sturz, Executive Director of the Vera Foundation, Inc., New York City, in a statement and in testimony before the United States Senate Subcommittee on Improvements in Judicial Machinery of the Committee of the Judiciary noted that, "We are now finding that large numbers of accused persons can be released on their own recognizance prior to trial. They return to court; they do not pose a serious threat to the community. Thus where the accused presents a relatively good risk of appearing, based on nonfinancial considerations, Vera recommends release on the defendant's recognizance. As of 1964, "3,200 accused persons have been released on their own recognizance in New York City's criminal court upon the recommendation of the Manhattan bail project. Of these 3,200 persons, 99 percent have returned to court when required. Only 30 persons—or 1 percent— failed to return."

of bail specified should bear a reasonable relationship towards furnishing an incentive to the accused to appear for trial.

This is, however, not done in those instances where the court expects the accused, who is unable to post collateral, to resort to a professional bail bondsman. ". . . Where the bondsman writes bonds on credit and without collateral (or if an accused can only pay a premium), no real risk of immediate financial loss deters the defendant from fleeing. The indemnity agreement usually required by the bondsman represents in these cases nothing more than the defendant's personal recognizance. The bondsman's practice has effectively negated the judge's bail setting, and the defendant might just as well have been released by the court on personal recognizance. Where the bondsman demands full collateral, he may frustrate the bail setting if the judge assumed that only the payment of a premium would be required. Where the bondsman absolutely refuses to write a bond no matter what the circumstances, the whole bail system is undermined." A.B.A., *Pretrial Release* at 62.

In the same vein, Judge BAZELON in his dissenting and concurring opinion in *Pannell v. United States,* 320 F. 2d 698 (D.C. Cir. 1963) noted that in the instance where the bondsman does not require collateral from an accused then the accused once set free on bail "has no real financial stake in complying with the conditions of the bond, regardless of the amount, since the fee paid for the bond is not refundable under any circumstances. Hence, the court does not decide—or even know—whether a higher bond for a particular applicant means that he has a greater stake." See also Note, Bail Reform in the State and Federal Systems, 20 Vanderbilt L. Rev. 948 (1967).[11]

---

[11] Other valid criticisms of the professional bondsman which do not relate to his ineffectiveness in securing the presence of an

Given the above, I do not believe that the administration of justice profits from its current reliance on

---

accused at trial have also been extensively made. For instance, the present reliance on the bondsman places him in the position of evaluating the risk that an accused will not flee a jurisdiction, if the accused is unable to post collateral. This conflicts with the policy that the court should be the party to set bail. Thus, although the court may have determined that an accused is a proper risk and should be released, the bondsman by having the right to refuse to post bail for an accused, can frustrate the intent of the court. In *Pannell v. United States*, 320 F. 2d 698 (D.C. Cir. 1963) Judge J. SKELLY WRIGHT in a concurring opinion wrote that "Certainly the professional bondsman system as used in this District is odious at best. The effect of such a system is that the professional bondsmen hold the keys to the jail in their pockets. They determine for whom they will act as surety—who in their judgment is a good risk. The bad risks, in the bondsmen's judgment, and the ones who are unable to pay the bondsmen's fee remain in jail. The court and the Commissioner are relegated to the relatively unimportant chore of fixing the amount of bail."

Moreover, "the bail bond business is subject to a variety of allegations of corruption. The charges range from alleged tie-ins with police and court officials, involving kickbacks for steering defendants to particular bondsmen, to collusion and corruption aimed at setting aside forfeitures of bonds where the defendants have failed to appear. Citations omitted. There even have been instances of bondsmen's strikes or refusal to write bonds when they have felt the authorities were too vigorously enforcing bond forfeitures.

"There is little doubt that, as a result of the heavy reliance on money bail, the professional bondsman siphons off large sums of money that might otherwise be put to more constructive use in the preparation of the defendant's case or in the support of his family. . . . Another justification advanced for the bondsman's existence is that he saves the state money by recapturing the defendant who fails to appear. The argument highlights the anomalous role of the bondsman in an era when procedural rights of criminal defendants are so carefully protected. The bondsman has an ancient right to arrest and surrender his principal at any time and for any reason sufficient to himself. . . . Moreover, if the bail-jumper being sought by the bondsman leaves the state, the bondsman may pursue and recapture him without the necessity of com-

bondsmen. It has been suggested that bondsmen facilitate the recapture of those who jump bail. Even accepting this contention arguendo, however, on balance with our concern for constitutional rights, we should not sanction professional bounty hunters who are unrestrained by constitutional limitations. Such a task is more properly the concern of the police.

When the practice of turning to bail bondsmen was first instituted in the 19th century, police departments were inadequate, ill-equipped and ill-trained; coopera-

---

plying with any of the rigorous extradition safeguards required of law enforcement agencies seeking a fugitive. . . [T]he methods often employed by bondsmen are hardly likely to promote respect for the administration of justice. . . . Finally, there is considerable doubt whether recapture is always accomplished without expense to the state. Bondsmen rely on police information and frequently call on local police to assist them in making arrest. No doubt in some jurisdictions under a bail system that has not been improved in years, the professional bondsman occasionally saves the state some costs of recapture in those few instances of willful bail jumping. It is more doubtful, however, that the net savings are very large or that, under an improved system, the money saved would in any measure justify continuing to delegate an important law enforcement function to private individuals whose own money is at stake. . . . The professional bondsman is an anachronism in the criminal process. Close analysis of his role indicates he serves no major purpose that could not be better served by public officers at less cost in economic and human terms." A.B.A. *Standards Relating to Pretrial Release*, 62-64. See also Freed and Wald, *Bail in the United States*: 1964, a report to the National Conference on Bail and Criminal Justice, Washington, D.C., May 27-29, 1964.

Commentators have also noted that "the bondsman exercises little control over the accused; although he may occasionally recapture a defendant who has jumped bail, the police could do this as effectively." Note, Preventive Detention Before Trial, supra. "In original theory the bondsman served to maintain close contact with the defendant in order to deter his flight. In urban communities this is now seldom true. The D.C. bail study reports that bondsmen make little effort to stay in contact with their clients pending trial."

tion between different jurisdictions was minimal; there was no body similar to the Federal Bureau of Investigation which had the power to cross state borders in pursuit of escaped felons; and communications between points separated by great distances was poor. Accordingly, there was considerable advantage to making use of the bail bondsmen who would "track down" those who jumped bail. Moreover, since the police were relatively unrestrained constitutionally, there was no policy basis on which to express a preference for police action rather than the action of a private citizen.

Conditions and times have changed, as have our views of constitutional requirements. Police today are better qualified than in the past, and are certainly more qualified than is the modern bondsman to locate and recapture an accused who has jumped bail. With the advent of the F.B.I., sophisticated technical advances, training of police and the establishment of professional police forces, the police have a decided advantage over the bondsmen in their ability to locate an accused who has jumped bail.

In this light, the modern professional bail bondsman must be considered an anachronism who makes no constructive or necessary contribution to the administration of criminal justice.

As the legislature has refused, by its silence, to endorse the principle of the professional bail bondsman, it seems to me that this phase of the administration of justice is properly the subject of judicial action.[12]

Although formidable, this task has been eased considerably by the fine study by the American Bar Association's Project on Minimum Standards of Criminal

---

[12] In this regard, it should be noted that the Act of May 12, 1921, P. L. 548, §1, as amended, 19 P.S. 71, requires that deposits accepted in lieu of bail by courts of record must be made by "sureties *approved by the said court.*" (emphasis added).

Justice under the leadership of Judge LUMBARD. That Project which until recently was headed by Mr. Chief Justice BERGER, recommended the following institutional changes to effect the above stated goals. As these standards are the result of a great deal of research and have been formulated by some of the finest observers of criminal justice in this country, there repetition at length in this opinion is warranted.[13]

In addition to the principles already set forth in Pennsylvania Rule of Criminal Procedure 4005, the Project recommends that "5.3(c) Upon finding that money bail should be set, the judicial officer should require one of the following: (i) the execution of an unsecured bond in an amount specified by the judicial officer, either signed by other persons or not; (ii) the execution of an unsecured bond in an amount specified by the judicial officer, accompanied by the deposit of cash or securities equal to 10 percent of the face amount of the bond. The deposit, less a reasonable administrative fee, should be returned at the conclusion of the proceedings, provided the defendant has not defaulted in the performance of the conditions of the bond; or (iii) the execution of a bond secured by the deposit of the full amount in cash or other property or by the obligation of qualified, uncompensated sureties.

"5.4 No person should be allowed to act as a surety for compensation. In any action to enforce an indemnity agreement between a principal and a surety on a bail bond it should be a complete defense that the surety acted for compensation. No attorney should be permitted to act as surety on a bail bond."

---

[13] In this vein it is important to note that the Pennsylvania Supreme Court has adopted the Project's standards as they relate to guilty pleas. See *Commonwealth v. Evans*, 434 Pa. 52 (1969).

## III

In conclusion, undoubtedly many who read this opinion will believe that the analysis set forth above introduces a new concept into our theories of pretrial detention. They will suspect that I am sanctioning a procedure whereby individuals may be incarcerated before trial without the protection previously thought to be afforded by bail.

These suspicions, however, are based on a lack of awareness of the realities of our system of criminal justice. Every judge and member of the criminal bar realizes that for the past century our jurisprudence has nurtured and spawned an insensitive system of preventive detention which has been uncritically applied to all accused persons without a searching analysis of the background of the individual accused himself.

The device which has been used to foster this system is the setting of bail beyond the means of an accused. The current revolution in criminal procedure involving the re-examination of an accused's constitutional rights has, unfortunately, by-passed examination of our bail system. As in the instant case, although a judge may hold a hearing, courts have not made on-the-record findings of fact to support their decisions to hold an accused in bail beyond his means. This has often resulted in basic unfairness to individuals who are unjustifiably incarcerated pending trial.

Moreover, the setting of high bail has been indiscriminately applied to those defendants accused of minor as well as major crimes which involve physical danger and has borne down most heavily on the poor. Thus, we are often confronted with the spectacle of persons accused of the most petty crimes languishing in jail for months on end waiting for their case to be called for trial.

Traditionally and for all practical purposes, appeals from the setting of such bail have, in most instances, been fruitless. The many months required to prosecute an appeal will often render the decision therein moot since the appellant will have been brought to trial in the intervening period.

This procedure needs reform. The bail system has only furnished the semblance of protection which upon close study is no protection at all. We cannot be so cavalier with people's liberties.

Therefore, I have outlined a procedure which preserves the rights of the accused. I believe that my suggestions are warranted by our state and federal constitutions and by the case law. These suggestions, in contrast to the present haphazard and loosely applied bail system, encompasses current constitutional concerns for protection of the accused and fundamental notions of fairness.

I believe that they will have the salutary effect of releasing the great many persons who are currently incarcerated pending trial who present no substantial predictable threat to either commit crimes of violence or to fail to appear at trial if bail within their means is set.

On the other hand, I recognize that the public must be protected from those sociopaths who present real and acute threats to the community were they to be released pending trial.

Thus, a judicially enunciated policy of pretrial detention with adequate procedural safeguards will have a limiting effect, reserving pretrial detention only for those persons whose pretrial detention is appropriate. In short, I am asking for a replacement of reliance upon questionable judicial intuition by reliance upon critical judicial examination and appraisal.

In summary, my proposal is as follows:

Defendants who present a substantial threat to commit future crimes of violence or those who are clearly and convincingly likely to fail to appear at trial if bail which is within their means is set are properly the subject of preventive detention prior to trial.

Pretrial detention, however, should only be utilized in extraordinary circumstances when no other controls are feasible. Moreover, before such detention can be imposed I believe it necessary to afford the accused a full and fair hearing at which time he should be informed of the grounds which the Commonwealth believes warrant his detention prior to trial. He should have the opportunity to cross-examine and confront witnesses against him and present evidence in his own behalf. If after this hearing, the lower court believes that his detention is advisable and in accordance with the principles set forth in this opinion it should make on the record findings which are subject to appellate review.

Further, unless there be extenuating circumstances, the accused should be brought to trial within sixty (60) days of his detention and efforts should be made to alleviate the hardships he suffers during his confinement prior to trial.

In all other instances an accused should be released pending trial, although certain limitations may be placed upon him by the court.

In those instances where an accused is released pending trial, his release should not be predicated upon his posting a refundable financial bond unless this would substantially improve the chances that he would appear for trial. In such instances, bond should be posted with the court without the aid of a compensated surety.

With respect to the appellants now before us, the record is devoid of findings by the lower court which

would justify their continued incarceration because of their inability to raise bail. Accordingly, this case should be remanded for a new hearing consonant with the principles relating to the setting of bail as stated in this opinion. In addition, as appellants have been incarcerated since early March 1969, they should be brought to trial without further delay if after a hearing they are still unable to effect their release.

